Class - Action Lawsuit 20 Plus inmates

RECEIVED
APR 03 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT LOUISIANA
BY BW

Form to be used by a prisoner filing a civil rights complaint under
THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

no $ paid

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

Joseph Davis #129227, et. al.
Full Name of Plaintiff, Prisoner Number
(and others similarly situated)

Civil Action ______

VS.

Judge ______

Warden Jerry W. Goodwin, et. al.
Defendant

Magistrate Judge ______

COMPLAINT

I. Previous Lawsuits

A. Have you begun any other lawsuit while incarcerated or detained in any facility?
Yes [ ] No [✓]

B. If your answer to the preceding question is yes, provide the following information.

1. State the court(s) where each lawsuit was filed (if federal, identify the District; if state court, identify the county or parish):

N/A

2. Name the parties to the previous lawsuit(s):

Plaintiffs: N/A

Defendants:

3. Docket number(s): —

4. Date(s) on which each lawsuit was filed: —

5. Disposition and date thereof [For example, was the case dismissed and when? Was it appealed and by whom (plaintiff or defendant)? Is the case still pending?]:

N/A

has been dismissed?
Yes _____ No _____

If your answer to the preceding question is yes, state the court(s) which dismissed the case, the civil action number(s), and the reason for dismissal (e.g., frivolity, malice, failure to state a claim, defendants immune from relief sought, etc.).

______________________________________________

______________________________________________

II. A. Name of institution and address of current place of confinement: All inmates NAmed herein are housed at: D.W.C.C.-670 Bell Hill Rd.-Homer, La. 71040

B. Is there a prison grievance procedure in this institution?
Yes ✓ No _____

1. Did you file an administrative grievance based upon the same facts which form the basis of this lawsuit?
Yes ✓ No _____
If Yes, what is the Administrative Remedy Procedure number? (See Attached)

2. If you did not file an administrative grievance, explain why you have not done so.

(See Attached)

______________________________________________

3. If you filed an administrative grievance, answer the following question.
What specific steps of the prison procedure did you take and what was the result? (For example, for state prisoners in the custody of the Department of Public Safety and Corrections: did you appeal any adverse decision through to Step 3 of the administrative grievance procedure by appealing to the Secretary of the Louisiana Department of Public Safety and Corrections? For federal prisoners: did you appeal any adverse decision from the warden to the Regional Director for the Federal Bureau of Prisons, or did you make a claim under the Federal Tort Claims Act?)

(See Attached)

______________________________________________

Attach a copy of each prison response and/or decision rendered in the administrative proceeding.

**III. Parties to Current Lawsuit:**

A. Name of Plaintiff (See Attached)

Address ______

B. Defendant, (See Attached), is employed as ______ at ______.

Defendant, ______, is employed as ______ at ______.

Defendant, ______, is employed as ______ at ______.

Additional defendants (See Attached)

**IV. Statement of Claim**

State the **FACTS** of your case. Specifically describe the involvement and actions of each named defendant. Include the names of all persons involved in the incident(s) or condition(s) giving rise to this lawsuit, and the dates upon which and the places where the incident(s) and/or condition(s) occurred. **YOU ARE REQUIRED TO SET FORTH ONLY FACTUAL ALLEGATIONS. YOU ARE NOT REQUIRED TO SET FORTH LEGAL THEORIES OR ARGUMENTS.**

(See Attached)

United States District Court
Western District of Louisiana

Joseph Davis #129227,
John Spotville #391374,
Joe Goods #108232,
Lee Lucas #388382,
Quindale Addison #367461,
Joshua Williams #421156,
John Birdsong #127307,
Robert Baltimore #412290,
Ronnie Riley #393420,
Jacques Morris #513711,
Lum Jones #465758,
Clifton Tucker #369393,
Wardell Jones #538874,
Donald Williams #093824,
John R. Harold #,
Randy Hall #,
Thomas Hunter #413712,
Robert Cooper #366080,
Kenard Robinson #393765,
Carlos A. McGrew #413135,
(and all other D.W.C.C. Inmates housed on N-1, N-2, N-3 & N-4, and on behalf of any/all others similarly situated), et. al.
(Plaintiff Class)

Civil Action

____________________

____________________
Judge

____________________
Magistrate Judge

Versus

Warden Jerry W. Goodwin,
Warden John Does x 2,
Medical Director / Coordinator,

(Warden Jane Doe x 1),
Mental Health Director,
(Warden Jane Doe x 1),
Entire Mental Health and -
Medical (Dental) Department:
Doctor Jane Doe x 1,
Nurses John Doe x 2,
(E.M.T.(S) John Doe x 2)
Psychiatrist John Doe x 1
Social Worker(S) John Does x 2,
Entire Classification Department:
(John Does x 2 and
Jane Doe x 1),
Entire Security Staff assigned to
South Side Compound: N-1, 2, 3 and 4.
Colonel Lonnie Nail
Captain John Does x
Lt. John Does x
Sgt. John Does x , et. al.

All defendants are being sued in their individual Capacity only as it Pertains to Seeking Compensatory ("Monetary") and Punitive Damages.

All defendants are being sued in their Official Capacity only as it Pertains to Seeking both Temporary and Permanent Injunctive ("Prospective") Relief

(a) All Plaintiff-Parties are inmates formerly/currently housed at David Wade Correctional Center in Homer, La., and are direct victims of the multiple abuses, mistreatment, torture, denial of basic human needs that routinely/frequently occur on the institution's housing units of N-1, N-2, N-3 and N-4, as outlined in Statement of Claims below.

(b) Defendant(s): Jerry W. Goodwin is employed as head Warden at the prison; ~~John Does x 2 as~~ Robert Rachel and Angie Huff are employed as "Deputy" Wardens at D.W.C.C.; Michele Dauzat is employed as "Assistant" Warden and Director over Medical/Mental Health Dept at D.W.C.C.; Paula Millwee is employed as Medical/Mental Health Co-ordinator at D.W.C.C.; John Does x 2 are employed as Nurses* at D.W.C.C.; Gregory Seal is employed as Psychiatrist at D.W.C.C.; Steve Hayden** and John Doe are both employed as Social Workers at D.W.C.C.; Lonnie Nail is employed as Colonel at D.W.C.C.; Mark Hunter and John Doe Dimerson are employed as Classification officers; John Does x ___ are employed as Correctional officers of varying ranks at D.W.C.C.

---

* Although these 2 defendants are presumed/considered to be "Nurses", they ~~were~~ wear the attire of E.M.S./E.M.T.s.

** Although Mr. Hayden is employed by D.W.C.C. in this capacity, he is not "Licensed" as such.

II. Statement of Claim(s):

a. Overcrowding / "forced" double-bunking: All inmates who're confined to D.W.C.C.'s extended lockdown housing units N-1, N-2, N-3 and N-4 are classified as Maximum Security / Custody Inmates.

b. In the most General use of the term "Maximum Security / Custody" means that inmates with this status are classified as being a threat to themselves, other inmates and Staff, and therefore unfit to live in the General Population.

c. As a Result of this "status" these inmates are confined to a cell for 23 plus hours a day, every-day with the exception of

i. daily 10 minute shower

ii. Medical / Mental Health call-outs

iii. occasional 25-35 minutes of outside Recreation.

d. These cells on units N-1, N-2, N-3 and N-4 are no larger than ____ sq ft., or Roughly ___ x ___; of which only a certain portion is accessible, usable by inmates confined therein.

e. Inside these same cells are 1 locker box — which is bolted to the floor, thereby limiting walk-around space — a toilet / sink and a concrete slab for a bed.

f. Despite some of these cells possessing an iron top bunk the cell itself is only designed for single-cell occupancy — the cell doors only permit one inmate to be handcuffed / shackled at ~~one~~ time.

g. Due to over-crowding understaffing and a complete lack of adequate housing space elsewhere inmates in these cells are "forced" to "double-bunk".

h. What is meant by "forced" double-bunking is that, because there is no enemy screening checks done on all inmates prior to placement in these cells, inmates are frequently forced to live with their enemies against their will.

i. Both known ("documented") enemies and potential ("unknown") enemies.

j. This forced double-bunking is often-times done over the verbal objections of both enemies inmates.

k. This "forced" double-bunking therefore results in cell fights between these inmates, some of which are extremely violent altercations — some even involving the use of weapons or other objects.

l. This action thus creates an unsafe living environment for said inmates, one that poses a risk of serious physical harm/injury to them.

m. Aside from the "bad-blood" rule violation involved here there are several other serious factors which creates the likelihood of future harm to these inmates under these conditions.

n. These serious risk factors include but are not limited to:

i. housing extremely large inmates with those who're extremely small (e.g., a 250 pounder with a 140 or 160 pounder).

ii. housing extremely violent inmates with others who're just as violent; or those who're not violent at all (there are actually inmates incarcerated who have never engaged in any kind of physical altercations with inmates, staff or otherwise)

iii. housing known and potential sexual predators with extremely vulnerable and potentially vulnerable/weak inmates.

iv. housing aggressive homosexuals with passive heterosexuals.

v. housing "infected" inmates — those with H.I.V., A.I.D.S. or Hepatitis-C — with ~~those who~~ healthy or non-infected inmates.

vi. housing severely mentally-ill or psychotic inmates in a cell with other inmates — sometimes (2) chronically mentally-ill inmates are "forced" double-bunked.

vii. housing opposing rivals or gang members on the same tier sometimes the same cell.

viii. housing (2) inmates in a cell designed for single-cell occupancy with extremely "cramped" limited space

ix. housing extremely unsanitary filthy inmates with those attentive to hygienic needs and sanitary living conditions.

x. extremely limited/disproportionate food portions between cellmates who often fight the other for extra.

xi. housing (2) inmates on a routine and continuous basis in a cell for 23 plus hours everyday, all day; during summer months in extremely hot, humid and increasingly aggravating weather — which cause cell-fights.

o. These environmental factors, both singularly or combined, create additional hostilities between (2) already embittered and angry inmates who're "forced" double-bunked, thereby increasing the likelihood of a physical altercation between them.

p. This takes an already volatile situation and makes it a "toxic" one for all parties involved — the inmates who could seriously injure one another and the officers who have to intervene in these violent clashes.

q. When various inmates attempt to prevent a violent encounter by initially refusing to enter a cell w/ a particular inmate (for fear of assault, etc.) they're threatened with a rule infraction. If this does not work then the refusing inmate is then threatened with physical harm at the hands of staff (either via chemical agent or otherwise.)

r. This results in a "forced" double-bunking.

s. Once inside this cell, inmates who dont fight or attack each other initially, but still seek to seperate and avoid violence alert staff that "they cant live together"

t. The typical and usual response given by staff toward the inmates in the above scenario is either:

(a) "fight it out with each other and then we'll move you"

OR (b) the complaint is ignored altogether.

u. To prove / validate these allegations there are documented incidents of these "cell-fights".

V. Some of these incidents were extremely violent Resulting in serious physical injuries for one or both inmates.

w. In fact, it is so over-crowded, with lacking (available) bed space for each inmate, that those inmates who seek / Request "Protective Custody" are Routinely denied - ignored simply because there is no available space to house all these inmates seperately.

x. So as a convenience, and in total violation of an inmate's Constitutional Right to humane living conditions (safe environment) they are "forced" double-bunked.

y. Inmates who attempt to "check-out" (i.e. seek P.C. status) but are denied are then looked upon by their cellmate in a negative and vulnerable light, thus inviting the occasion for predatory actions / acts.

z. Despite the obvious need to keep inmates single-celled and seperated in the face of such hazardous and dangerous living conditions, D.W.C.C. staff choose to openly disregard A.C.A. Standards, Federal and U.S. S. Ct. Precedent (Regarding 8th amendment protections) and instead choose to openly expose inmates to harm or physical violence.

*** ***

aa. In addition to being "forced" double-bunked with other inmates who pose a physical threat to their safety and well-being, all inmates housed in units

N-1, N-2, N-3 and N-4 are housed in cells that are not adequately equipped for two (2) person occupancy.

ab. In these cells which do have bunk beds there are no step-ladders or foot holds to permit the safe and easy access to the top bunk without (the inmate assigned to top bunk) Risking a painful fall or slip.

ac. Inmates assigned to top bunk must use the sink (face bowl), toilet or cell bars as leverage in order to climb atop to reach bunk.

ad. Not only is this unauthorized method a rule violation (property destruction), it is also very dangerous and hazardous to an inmate's personal safety because, if he slips and falls or loses his balance or grip, the only fate that awaits them is a cement floor, and a bolted-to-the floor metal locker-box with pointy/sharp corners, edges.

ae. This is adds to an already dangerous environment for inmates so confined.

af. There are both documented and undocumented incidents where inmates have fallen and seriously injured themselves.

ag. Inmates have also complained to defendant Goodwin, staff and others about the need for ladders and the possible dangers posed due to a lack thereof.

ah. The fact that there are no step-ladders means that inmates in top-bunk must leap or jump down, exposing themselves to serious

injury in their joint (knees, ankles and foot) area.

ai. This is even more arduous and burdensome on inmates who are over weight, those with a medical condition (in their legs or back) or those up in age.

aj. Defendants Goodwin, et. al. is wholly aware of these factors (hazardous living conditions), the need for step-ladders (past complaints) and in spite of the obvious (future "falls"), refuses to take corrective action.

ak. There is therefore an imminent need for the issuance of a "Temporary Restraining Order" and "Injunctive Relief" prior to the resolution and finalization of this civil action[1].

* * * * * *

al. The method and way that laundry services are conducted and provided here at D.W.C.C. are not only extremely questionable, raise cause for great concern, but are very unhygienic and unsanitary, and poses a threat to inmates' physical health and safety by way of skin borne diseases and other highly contagious bacterial infections (such as "Staph", crabs, mites, lice, etc.)

am. Prison-issue jumpsuits worn by all inmates housed on units N-1 -thru- N4 are "washed in bulk".

an. So bulky is the load, in fact, that this prevents them from being thoroughly and properly washed.

ao. Combined with this fact/procedure is the use of overly diluted[2] detergents used to wash jumpsuits.

---

1. See accompanying Memorandum of Law/Request for T.R.O./P.I.
2. Just one of the so-called cost-effective measures taken to save money.

ap. The ultimate Result of this is that inmates are Re-issued the very same Jumpsuits, partially cleaned. The very same ones that were soiled, sweaty, stained and reeked of foul, smelly odors — ones that were sent to be cleaned.

aq. Per Prison Policy inmates on units N-1 thru N-4 are forced to wear these same Jumpsuit all day, every-day during daylight hours.

ar. This "forced"[3.] unsanity practice facilitates the passage of skin borne disease, ailments and other bacteria to travel from unit to unit, tier to tier and inmate to inmate.

as. There are both documented and un-documented incidents of inmates breaking out with unexplainable rashes and other skin infections and sores[4.]

at. As it concerns personal inmate clothing such as socks, boxers, t-shirts, etc., the very same process takes place as with the Jumpsuits, thereby bringing about the same end results: Dirty, smelly laundry returning unwashed, unclean (partially cleaned).

au. Standards of cleanliness and being hygienic vary widely amongst inmates. In fact, some inmates are very unsanitary and have no sense of cleanliness, while others are just the opposite.

av. A very serious and threatening health hazard surfaces when you combine and factor in these (2) elements: Dirty Clothes and absence of hygiene.

---

3. Inmates who refused to wear dirty unwashed Jumpsuits are threatened with R.V.R. (Rule Violation Reports).

4. A severe documented case was inmate "Dwayne Howard"

aw. To further exacerbate these horrendous conditions the laundry is taken up and collected late at night, sometimes in the wee-wee hours of the morning or right before the morning shift change at 6 a.m.

ax. This laundry is washed later that day and ~~the~~ brought back to the housing unit in large blue buggies.

ay. These buggies usually arrive sometime before or between 10:00 a.m. and 12:00 p.m.

az. Rather than bring these buggies inside the unit so that said laundry could be passed out, it is instead left outside the unit, in front of the building, until nightfall; until the next shift change takes place at 6 p.m.

ba. The night shift may or may not elect to bring these laundry buggies inside immediately — usually not though.

bb. Instead, and most of the time, these buggies are left outside, exposed to the elements, and are not brought inside and passed out until well after midnight — well after inmates have showered and returned to their cells for the night

bc. As a result, inmates are forced to shower and put back on the same dirty laundry until they receive their ("partially") cleaned laundry sometime after midnight.

bd. A great majority of the time when these laundry cart ("buggies") are left outside all day and exposed to the elements — even when it rains these carts are outside — by the time an inmate receives it

his bed linen and underclothes are soiled and "damp" and contain countless insects and other bugs: Beetles, Spiders, Crickets / Grasshoppers, ants, mosquito and fly Larvae and other biting insects (vermin).

be. On the select days when sheets and blankets are washed seperately, the exact same procedure takes place: Damp, moist linen-blankets, full of bugs and other vermin.

bf. Due to various temperatures on certain days, a lot of these items return "smelly" and needing a second wash.

bg. As of result of this, inmates subjected to this treatment often develop skin rashes, sores, allergic reactions and often times are "bitten" or stung by insects / bugs.

bh. The staff here at D.W.C.C. are wholly aware of this unsanitary practice and yet, despite verbal and/or written complaints, purposely ignore and elect not to do anything about it.

* * * * (Patterns of abuse: Physical and Sexual)

bi. Quite often, inmates at D.W.C.C. extended lockdown (units N-1 thru N-4) are victims of unchecked / unrestrained physical abuse and sometimes sexual abuse at the hands of unprofessional and sadistic male Guards.

bj. One form of physical abuse is the unwarranted, unjustified use of excessive chemical agent on "already restrained" (locked in a cell) inmates.

bk. This excessive use of chemical agent by D.W.C.C.

Staff upon extended lockdown inmates on N-1 thru N-4 is both widespread and Rampant.

bl. Rather than a last recourse, it is instead employed as a first course of action whenever there is any interaction between Staff and inmates.

bm. Inmates are Routinely threatened with and both sprayed with chemical agent simply for talking too loud and/or Refusal to "shut the fxck up" when yelled at to do so by Staff.

bn. Even so, as opposed to using a mere one or two second burst — as the fabricated R.V.R. often state — D.W.C.C. staff are "emptying the entire can" on already confined inmates. Sometimes 2 or more cans are used.

bo. A Great majority of the time this is done while an inmate is housed with a cellmate.

bp. So without any Regard for the uninvolved cellmate, chemical agent is sprayed into the cell.

bq. Even those inmates who have a medical condition that prohibits use of such (i.e., those with asthma or some other Respiratory illness) these inmates and other similarly situated are still subjected to chemical agent use — with no one bothering to consult an inmate's medical file.

br. This Results in a serious threat being posed to said inmates' health since the very purpose of chemical agent is to take away one's ability to breathe clearly — it strips the air of oxygen, which could lead to death.

bs. Due to these incidents taking place inside a closed-in, air restricted environment (a prison cell with poor ventilation) as opposed to outside in the open air the danger-threat of serious physical injury, i.e., unconsciousness, "blacking out", or even death by aphyxiation is greatly heightened.

bt. Inmates' verbal complaints (prior to being sprayed) regarding this danger and possible outcome are blatantly ignored.

bu. As a result of this abuse, inmates do file formal grievances regarding the use of excessive chemical agent.

bv. Yet when they do, only of two things happen (sometimes both):

i. The inmate is openly retaliated against until he "drops" or withdraws complaint, or

ii. The allegations are downplayed and not taken seriously; Relief is <u>always</u> denied.

Nothing is ever done in the way of a formal investigation.

bw. Even when the use of excessive force is apparent, D.W.C.C. staff are **never** disciplined and therefore operate with impunity and free reign.

bx. This free reign (impunity) creates and facilitates an environment for [culture of] abuse.

by. Although D.W.C.C. staff have and possess (per policy) the actual equipment needed to record-live all incidents involving the use of force [via minicam/camcorder] they purposely and routinely forego this course of action to ensure their wrongdoing-misconduct is not captured on film.

bz. This cultivates a 'Culture of Abuse' which ultimately encourages sadistic male guards — who already have a propensity for mistreating inmates — to take advantage of inmates by openly abusing their authority.

ca. The same holds true for claims involving sexual assault/abuse as well as intentional mistreatment of mentally ill inmates: who're easily taken advantage of, manipulated and goaded into certain acts which then permits these sadistic male guards to respond in a hostile manner.

cb. Inmates are restrained with handcuffs, blackbox, etc. thru food slot; upon entering the cell these inmates are then shackled with leg-irons. It is at this point — while in full restraint and unable to be seen or observed by other inmates — that sadistic male guards take it upon themselves to physically assault/abuse these inmates, especially the mentally ill ones who lack the mental capacity to adequately lodge a formal complaint.

cc. The abuse and mistreatment by these sadistic male guards consists of punching inmates in their chest and torso (known as body blows),

hard slaps to facial area as well as Groping and inmates Genitals or buttocks.

cd. This type of overt sexual abuse is not just limited to Gay or known homosexual inmates.

ce. A lot of heterosexual inmates are often the victims of bi-sexual and "in the closet" male Guards.

cf. An officer's sexual orientation or preference is not public record and therefore easy to deny, should accusation surface.

cg. This thus places victim-inmates in a no-win situation because:

i. No one can "see" inside an inmate's cell, and

ii. There is no physical evidence that remains after being "Groped" inappropriately.

ch. With these institutional safeguards in place a sadistic male Guard can continue this behavoir without fear of Getting caught.

ci. Another illegal practice of D.W.C.C. Staff when restraining inmates is the use of "Corporal-Punishment" by ordering inmates to Get on their knees".

cj. although this is a widespread practice and widely enforced it is not authorized, permitted or sanctioned by any formal or written policy or departmental regulation issued by D.O.C. Headquarters.

ck. The pretext used to Get inmates to comply with this verbal policy-mandate is to permit them to

. Shackle inmates with leg-irons.

cl. Yet, when inmates do "catch their knees" certain male Guards (those that are secretly/openly Gay) take this opportunity to walk directly upon kneeling inmate and place their "crotch-area" in their face, the sexual suggestive nature of this act being obvious and clear.

cm. As would be anticipated, any heterosexual male inmate would find this overt gesture disrespectful and highly offensive and thus "Re-act" aggressively.

cn. This reaction usually ends in an argument, or worse, a physical confrontation wherein the fully-restrained inmate is assaulted and brutalized simply because he took offense to the blatant sexual advances of a sadistic (homosexual) male Guard.

co. Though this sexually suggestive act by Gay male Guards is hard to prove — an inmate's word against that of 2 or more officers — this is a very frequent, though undocumented, occurrence between inmates and staff at D.W.C.C.

cp. One that is both degrading, humiliating and cruel and unusual.

cq. Inmates who elect to forgo this degrading and humiliating treatment often do so at the expense of forfeiting their outside yard recreation.

cr. Even worse degrading and humiliating treatment is inflicted upon the severely mentally ill. D.W.C.C. Staff are aware that they're too "slow" to do

anything to vindicate their rights.

cs. These severely mentally-ill inmates are "slapped", "punched", "kicked", "sprayed w/ chemical agent" "choked" put in painful holds, etc often resulting in serious injuries.

ct. Yet, because of the severity of their mental illness they dont even seek medical attention. They instead suffer in silence ... ...

cu. These brutal acts are often perpetrated by the very same sadistic male guards who assault severely mentally-ill inmates and others out of sheer gratification and malice.

cv. A great majority of the time, the only justification the D.W.C.C. staff have — for spraying with chemical agent — is an inmate talking or not talking (whispering) low enough.

cw. Rather than issue an inmate a R.V.R. (Rule Violation Report) for disobediance[5], sadistic male guards instead opt to use excessive force via excessive use of chemical agent upon them.

cx. Once done (i.e., once use of chemical agent is employed) these sadistic male guards then falsify / fabricate bogus R.V.R.'s upon inmates to help cover-up - justify their wrongdoing.

cy. The few inmates who do have the means to file a grievance are both penalized (retaliated against) and ignored in response thereto.

cz. In fact, no matter how inhumane or excessive the mistreatment is, no matter how strong the evidence, the complaint is __Never__ investigated

---

5. Per policy or as policy states.

and Reprisals / Sanctions are never issued. The accused Guard simply writes a statement denying the accusations and Relief is then denied.

da. With regard to Sexual Assault claims, D.W.C.C. staff have completely ignored the Prison Rape Elimination Act (P.R.E.A.), codified in /as Dept. Regulation # C-01-022, which sets the strict Guidelines / Protocols to be followed when addressing such allegations.

db. One provision in this Dept. Reg. mandates that inmate and officer (the accused) are seperated immediately and that:

(a) An Investigator be summoned
(b) Medical Dept. be notified
(c) Photos are taken
(d) Statements are recorded
(e) Mental Health Dept. provide counseling.
(f) a deputy sheriff is called to see if criminal charges are warranted.

dc. Despite all the reported Sexual Assault claims made by inmates since the passage of P.R.E.A., D.W.C.C. have never followed policy (and federal law) when addressing such allegations.

dd. In fact, the same outcome that takes place when denying A.R.P. Relief results when a sexual assault claim is made.

* * * * (Outright Torture: ill / mistreatment of chronically "severely" mentally-ill inmates)

de. The presence and staffing of an adequately trained and functioning Mental Health Department

here at D.W.C.C. is completely void, lacking and virtually non-existent.

df. There are a slew of inmates at D.W.C.C. housed on units N-1, N-2, N-3 and N-4 that are seriously mentally ill and are in dire need of proper and professional psychiatric treatment & care.

dg. Chronically mentally-ill inmates at D.W.C.C. are not receiving it.

dh. Regardless of how seriously-ill or decompensated an inmate may be, the most he will receive in the way of Mental Health care is placement on Standard Suicide Watch under the most horrendous (living) conditions ever known to exist inside of a prison; and for unwarranted and exceedingly long periods of time; in addition to "over-doping" of these same inmates on psych-meds.

di. At a minimum, these same inmates "may" see a psychiatrist or psych-doctor, but only every 90-120 days at the most, and only to ascertain whether the inmate would like an increase or decrease in his current medication.

dj. There is absolutely no Group Counseling, One on One, or Psycho-therapy for those severely mentally-ill inmates who need it the most.

dk. Severely-Chronically mentally-ill inmates housed on units N-1 thru N-4 suffer the following whenever placed on Standard Suicide Watch:

(a) Placement in a barren cell that is filthy and lacking (in) the basic necessity: a mattress, toilet paper, a wash cloth, bath towel, soap, toothpaste, etc., a clean-up rag and cleaning-supplies to sanitize cell, floor, toilet, sink.

(b) extreme weather (temperatures) conditions: In the winter months all windows are left opened; the ventilation ("blowers") system are turned on[6]; the shower water temperature is "scalding hot" during the summer time; while during the winter months it is "ice cold", or well below room temperature (e.g., if the room temp during winter is 50° or below on the tier, then the shower will "feel" 40° or lower); during scorching hot summer mths, inmates are deprived of "ice", ice-water, "cool" water shower temp, as well as sufficient number of industrial size fans. The cell and hall lights are left on all day![7]

dl. All of the above conditions are amplified when an inmate is only given an extremely thin (hospital-issue) examination gown — the kind made of easy-to-tear paper — while on suicide watch or under some other form of observation.

dm. Such living condition constitute torture. A torture that is often and routinely inflicted by mental and security staff at D.W.C.C.

dn. During these times of brutal torture by way of cold temperatures, sadistic male guards have been known to throw cold water or other liquid substances on inmates.

---

6. Ironically, the ventilation system works excellently every winter, but amazingly they're "always" broke when summer time rolls around.

7. Additionally, inmates must wear jumpsuits all day, even when overheated.

do. These inmates who are on suicide watch or other forms of observation are routinely denied the right/opportunity to shower if they so chose.[8]

dp. The Mental Health Staff here at D.W.C.C. are all well aware of the widespread abuse and mis-treatment and yet purposely turn a blind eye and openly sides with Security Staff.

dq. During the blistering hot summer months, those who take psychotropic medications that have what is termed heat pathology have to suffer even worse, moreso than others.

dr. These "heat pathologies", a secondary reaction to the psych-meds, causes the recipients (who take meds) body to over-heat uncontrollably.

ds. Once over-heated, these inmates are forced to face head-on the threat of: ~~[illegible]~~ dehydration, heat-stroke and death (hyperthermia), simply because they're deprived of ice-ice water, cool showers to help lower/regulate their body temps; while being compelled to remain fully-clothed, exposed to heat-producing cell lights and deprived circulating air (fans).

dt. Thus these inmates are subjected to torture via excessive heating conditions ___ all of which are known to all defendant parties[9] named in caption of this complaint.

du. Some of these inmates are "So far Gone" that on a daily basis all they do is engage in animated conversation with themselves; scream and yell all day; flood their cells out with toilet water; bang on the bars, toilet or iron bunk all day; defecate

---

[8] e.g. if these inmates remain on suicide watch they're deprived of a month's worth of showers, etc.
To punish inmates for going on watch, they are left on involuntarily

on themselves and/or throw it at themselves or others. (Sometimes smear it and eat it or toss at Security)

dv. These same inmates (who've decompensated) go weeks and months without bathing or cleaning their own cells.

dw. This in turn creates a foul stench which, during the extremely hot summer months, results in the entire tier reeking a foul malodorous smell. A smell that permeates an already cloistered[10] atmosphere/environment.

dx. These same severely mentally-ill inmates who're purposely allowed to decompensate very often go without eating their food.

dy. These same chronically mentally-ill inmates are **tortured** as a result of there mental-illness, and in response to it — all of which is well-known & "openly" condoned by D.W.C.C. Mental Health Dept. (In particular, Steve Hayden)

(The need to keep extremely paranoid (mentally-ill) inmates) seperated)

dz. Inmates who observe their "paranoid" cellmate attempt to "check-out" (i.e., seek protective custody) and are denied (P.C. status), often feed on this fear and grow aggressively violent and hostile toward what, now appears to them, as a **weaker** and **timid** inmate.

ea. This subsequently results in a brutal fight or even worse a **sexual assault** where the weaker inmate is raped or sodomized by the much more aggressive and stronger cellmate.

---

[10] During these scorching summer months with intensely high humidity, the ventilation system is often broken, turned off or not working properly — something D.W.C.C. staff is well aware of.

eb. There are well documented cases in the form of A.R.P.'s, letters and informal complaints that hint at and allude to D.W.C.C. staff openly condoning[11.] this type of behavior, or downplaying it altogether by ignoring the obvious: ~~st~~ situations that (could) pose an immediate threat to the inmates physical safety and well-being.

* * * * (Deprivation of Recreation by Lazy officers)

: Insufficient out-of-cell exercise periods; lack of exercise equipment or sufficient "space" to exercise in; denial of hall-time during inclement weather (rainy days, etc.)

ec. Although D.W.C.C. policies, etc. state that inmates are to be given out-of-cell recreation time at a minimum of 5x a week within a 7 day period this policy is not acknowledged, honored or consistently enforced.

ed. Inmates housed on units 1, 2 and 3 who're already forced double-bunked against their will[12.] "may"[13.] receive, at a maximum, 1-3 days a week out-of-cell time for recreation.

ee. Receiving a maximum of 1-3 days a week on a consistent basis is both very rare and infrequent.

ef. Inmates on these units (1 thru 4) are lucky if they get 1 day of the week every week.

eg. The reason for these consistent denials of out-of-cell recreation periods is due to D.W.C.C. attitude toward the same: D.W.C.C. staff regard out-of-cell recreation time as a mere "privelege", as opposed to const. right.

---

11. Inmate-Victims are often too ashamed, ~~embarrassed~~ embarassed and guilt-ridden to report the sexual assault aspect. However, it becomes widely known amongst the inmate population, some of whom make prison life a living hell for the new turn-out inmate-victim.

12. See State of Claims a-z above.

13. "May"; meaning this is not guaranteed (at all)

eh. As a result of this attitude D.W.C.C. staff only honor or acknowledge this privelege whimsically (i.e., if they "feel" like conducting yard call or not. "If they do so, cool. If not, "oh well".)

ei. On the days these officers "feel" up to giving an inmate out-of-cell recreation they do so in the following manner:

(a) "Sneak" on the tiers very early in the morning when inmates are known to be sleep and mark them (inmates) down as having "Refused" or "Refusal" by them not speaking up.

(b) Not announcing their presence or intention (i.e., yelling "Yard Call" loud enough to give inmates notice) when they (officers) arrive on tiers to conduct Yard Call.

(c) Not allowing inmates adequate enough time to prepare for out-of-cell recreation (By "zooming" on the tier and then "zooming" off).

ej. This ultimately results in a constructive denial of a federally guaranteed constitutional right: out-of-cell recreation on a reasonable basis.

ek. Additionally, these same officers also frequently mark "Refusal" by an inmates name on the yard log sheet.

el. Inmates are never asked in advance whether or not he is "Going on the Yard".

em. Even those inmates who elect not to go, they're not required to sign their name to

show proof of voluntary refusal as opposed to involuntary refusal, or out-right denial.

en. These "Lazy" officers instead falsify documentation as if inmates were offered their right to out-of-cell and knowingly refused.

eo. Also, those inmates who cant go outside for whatever reasons — be it inclement weather or fear of encountering another inmate (enemies) — are not given the option of "hall-time".

ep. The halls upon which all these are on provide ample enough room and space to permit exercise (out-of-cell), albeit in a limited form and/or limited range: The length of said halls allow, with the right footwear, Running, Jogging, Jump-N-Jacks, etc.

eq. However, there is no exercise equipment on either the halls or the Recreation Yard Pens. Such as:

(a) No dip bar
(b) No pull-up bar
(c) No weight bench
(d) No dumb bells
(e) No step-up platform
(f) Neither is there adequate space on yard pens to run or jog, etc.

er. The Recreation Yard Pens that inmates are placed in are virtual dog cages and are too small to permit an inmate to

(a) do Jump-N-Jacks (height of cage too short)
(b) pick up a decent stride for Running

/ Jogging Purposes.

es. This ultimately Results in a deprivation of adequate out-of-cell exercise which only further endangers an inmate's personal / overall health[14].

et. With the current diet inmates Receive at D.W.C.C. on extended lockdown (Pure starch: lots of noodles pastas, Rice, bread, beans; excessive amounts of sugar; saturated fats, etc.), the dangers of a "forced" sedentary existence (confinement to a cell) of very limited space for 23 plus hours everyday, combined w/ Grossly inadequate opportunities to engage in meaningful exercise (cardio/aerobics) Greatly threatens an inmate's short and long-term health.

eu. These facts cannot be overlooked or denied.

ev. The need for access to adequate out-of-cell Recreation is imperative and life-sustaining.

ew. The need for a Reasonable opportunity to engage in meaningful exercise [in order] to stimulate cardio-vascular / cardio-pulmonary system is an essential necessity in order to maintain ideal or optimum health.

ex. An inmate's Right to adequate out-of-cell Recreation is Not Regarded or Respected as a constitutional Right by D.W.C.C. staff.

ey. It is instead viewed as a mere "Privelege" to be provided at the whim of D.W.C.C. staff.

ez. This unrecognized Right is also "frequently" taken away, withheld or suspended for unrelated Reasons.

---

14. This is especially true and significant when you consider the extremely poor and limited diet choices an inmate has: white Rice (Pure starch) is served 10-14 x a wk.

(Exposure to Excessive Heat Excessive Cold)

fa. Inmates housed on extended lockdown at D.W.C.C. on housing units N-1, N2, N-3 and N-4 are subjected to some of the most barbaric and inhumane living conditions today in the modernized Prison System.

fb. During the summer months of every year — which have historically become hotter and hotter — inmates on these units are exposed to excessive and (sometimes) unbearable "heat" conditions.

fc. Currently, there are No permanent fans affixed to any of these tiers[15]; there are No ice chest or water fountains located in any of these units or on the individual tiers. And there is No properly functioning ventilation system (blowers) to help keep these tiers cool.

fd. Even the showers — in the scorching summer months — are turned up too high("hot"). Request to have them turned down go ignored.

fe. Climatology Reports from the National Weather Service for the last 3-5 years will show that each preceding summer experienced record triple digit temperatures.

ff. In the buildings that houses units N-1, N-2, N-3 and N-4, each one lacks the above which would help to minimize an inmate's suffering under these barbaric and horrendous conditions.

fg. The humidity (heat index) factor is and will always be in excess of whatever the actual temperature is. (E.G., 90° will feel like 100°-105°)

fh. In a small, cramped and confined space such as a cell designed to house one person but housing two instead, D.W.C.C. Rules mandate inmates remain fully

---

15. The only exception is N-1 A-tier (C.C.R.) only because inmate "A. Woodfox" is on this tier. N-1 A tier has 4 or 5 fans; 2 ice chest; 4 or 5 T.V.'s; as well out-of-cell "hall time".

clothed in hot, irritating Prison-issue Jumpsuit.

fi. In addition to this, the individual cell lights are left on all day purposely.

fj. D.W.C.C. staff are well aware of the additional heat emitted from these lights, and yet purposely leave them on as a means of torture.

fk. All of this combined with inmates being forced double-bunked during these same grueling summer months.

fl. Such environmental conditions precipitate the subjection of an inmate to all of the following: profuse sweating, dehydration, heat strokes, over-heating, severe agitation and irritation (sensitivity) — all harmful / noxious conditions that pose an immediate serious threat to an inmate's health and safety.

fm. When you force double-bunk 2 inmates in a living space designed for only one person under such stressful and tortuous condition, you invite the opportunity for violence, danger and physical harm.

fn. As a result of these combined elements: Excessive Heat, Cramped/Crowded living space, cell-fights (i.e., inmate on inmate assaults) surge during these summer months; even moreso than any other time of year.

fo. Another adverse result of the heat, which also aggravates individual inmates and leads to physical assaults, is the presence of foul odors, bad smells, body odors, etc. which further create a "hostile" living arrangement between two (2) inmates forced double bunk in close, cramped quarters.

fp.

fp. A Great majority of inmates here at D.W.C.C. who're housed on extended lockdown suffer from conditions increasingly symptomatic of irritable bowel-syndrome, diarrhea, dysentery and other painful intestinal and lower abdominal pains / conditions.

fq. These same inmates are suffering from a slew of other mouth and throat infections. A Great majority of these complaints which are either downplayed, ignored and /or trivialized.

fr. The suspected cause of these mouth, throat, stomach and abdominal / bowel complaints are tied to over-chlorinated and "contaminated" drinking water that runs thru the already corrosive and disintegrating metal pipes of D.W.C.C.

fs. The actual colour of the drinking water that comes from the faucet (sink in the individual cells) and the shower heads is a brownish-orange rust tint.

ft. This is a daily-common occurrence at several hours at a time thru the day. This brown-orangeish water comes out of both the hot and cold pipes.

fu. Surprisingly, inmates are prohibited from purchasing out of the canteen: bottled water, soft drinks, fruit juices or other liquid mix drinks while on extended lockdown at D.W.C.C.

fv. Inmates housed on units: N-1, N-2, N-3 and N-4 are left with no other alternative but to consume the highly polluted[16.] and extremely foul smelling-tasting[17.] brownish-orange water.

fw. Depending upon what time of night inmates on these units are permitted to shower they must choose

---

[16.] The plumbing system has been known to back up causing previously flushed fecal matter to come back up thru pipes.

[17.] There have been verbal complaints of urine / feces in drinking water

between showering in water that has a brownish-orange color and reeks of excrement or elect to completely forego showering at all.[18]

fx. The D.W.C.C. staff is well informed of these water-related complaints, as well as the potentially dangerous/harmful ill-health effects that could result. In particular, the Institution's Maintenance Crew and head Security Personnel are apprised of this situation but purposely elect not to do anything. In fact, the only remedial steps taken by D.W.C.C. staff is to over-chlorinate already **polluted/contaminated** water.

fy. The overchlorination of the drinking water supply itself is sufficient to disrupt an inmates natural digestive system and cause "adverse" health effects, such as upset stomach, diarrhea, irritable bowel syndrome and the like.

fz. The use of chlorine by itself is only intended to kill possible parasites and other live harmful micro-organism that may be in a suspected contaminated water supply. The use of chlorine does nothing in the way of eradicating rust particles and other trace metals that are prevalent in a water supply due to severely corroded metal piping.

(Unclean Unsanitized Food Supplies/Utensils)

ga. In addition to all the other serious dangers and potential health hazards outlined above inmates at D.W.C.C. (units N-1 thru N-4) must use and eat out/off of **uncleaned** and **unsanitized** eating/serving utensils: Cups, spoons, trays, inserts, Steamline, etc.

---

18. Inmates occasionally miss several days worth of bathing. Others choose to shower anyway when it's "not so bad". Thus, a multitude of skin-related complaints due to bathing in polluted water, etc.

9b. At every meal inmates are NOT Given easily to clean / Sterilized "Plastic" cups but are instead Given hard to clean / Sterilize "Rubber" cups that are "Chewed", "Stained" and always contain a "Greasy film" on it.

9c. These same "Rubber" cups, despite being washed, are Returned to the housing units (and issued out during feed-up time) Still containing food particles (dried-inGrained).

9d. These "Rubber" cups are very difficult to clean; there're NOT anti-microbial either.

9e. The D.W.C.C. Personnel assigned to the kitchen who oversee the Cleaning and washing of all food utensils are NOT doing their Job in this Regard.

9f. Because of the extreme difficulty associated with Cleaning these "Rubber" cups they should Quickly be Replaced by easily Re-usable, Re-washable "Plastic" ones.

9g. In the alternative, inmates on extended lockdown (N-1 thru N-4) should be Permitted to [Re-order] Purchase their own cups or Quart Containers out of the Canteen — the very same plastic items which are sold to other inmates (on N-1 / A-tier)

9h. The very same Complaints lodged against these "Rubber" cups holds true for the eating utensils and serving trays.

9i. These too are improperly washed, cleaned or sterilized and Quite often contained dried or stained food on the spoons and trays — food particles of the Previous meal. (e.g., if oatmeal or Grits are served at breakfast, at lunch you will find dried oatmeal / Grits on these same spoons and trays that were "supposedly" washed)

9j. These same spoons are often "chewed up", broken "jagged-edged" or "cracked" as are some of the meal trays.

9k. After multiple washes over a several year period these same trays have become "discolored", "cracked" and started to "peel" in the area where the food portions go at.

9l. These same "chipped" utensils often end up in the food themselves, thus causing unsuspecting inmates to ingest these plastic (sharp/pointed) particles.

(Roach [Vermin] infestation)

9m. On each of the housing units (N-1, N-2, N-3 and N-4) there are "steam tables" in the lobby that are used to keep the food that arrives from the kitchen hot as it is being served to inmates on the tiers.

9n. These very same steam tables which are supposed to be properly cleaned and sanitized after every meal are infested with nest and colonies of roaches — both large and small.

9o. All that is needed to validate this claim of roach investation on the serving line (steam table) is to "bump" it slightly and several sets of roaches appear all at once.

9p. These same roaches are present on these steam tables during "feed-up" times also; ~~and~~ occasionally landing or ending up in an inmates food.

9q. The inmates who serve the food and the D.W.C.C. staff who oversee food preparation / serving, and routinely assist in passing out meal-trays, are wholly aware of this roach infestation problem.

9r. Yet, because this Roach infestation Problem has Persisted so long, unchecked, there is a widespread attitude of Non-chalance and apathy toward addressing or Rectifying the situation, ~~as~~ even in the face of written / Verbal complaints to the same.

9s. This issue of severe Roach infestation is not limited to these individual units or these steam-tables.

9t. The Problem of Severe Roach infestation is also Grossly Prevalent in the "Northside Compound Kitchen" where all inmate food is stored, cooked, Prepared and eventually served.

9u. The Problem of Severe Roach infestation is more concentrated and much more excessive in this North-Compound Kitchen.

9v. a mere trip or tour down the serving line in this North-Compound Kitchen will easily show:

I. Small colonies of baby Roaches crawling all along the Perimeter of this serving line as they collect their food.

II. Dried out or abandoned Roach eggs "stuck to" or clinging to various Parts of this serving line.

9w. Again, All D.W.C.C. Personnel — who Purposely Refrain from eating food Prepared there for obvious Reasons — are well aware of this Problem.

9x. Yet, for similar Reasons, nothing is or has ever been done about it.

9y. The Roach infestation Problem is so bad that all it takes is a few minutes of leaving out Just Prepared / soon-to-be served ~~inside the~~ food ~~inserts~~ inside steam table / serving-line insert Pans, before a small band of Roaches appear and then "attack" it.

g2. Inmates serving the food, and the staff who oversee them, must literally "swat", "fan" or "shoo away" the bands of Roaches who congregate around the food.

h2. There is a dire and very urgent need for a Professional:

I. Health/Food Inspector

II. Exterminator

to help rid both the Kitchen and Units of this severely Gross "Roach Infestation" Problem.

III. Claims for Relief:

a. That the Parties named herein were all acting **under color of State law** during all times relevant to this civil action. That these same Parties named herein purposely conspired to violate the Plaintiff-Parties' named herein civil rights while acting under **color of authority** as employees of David Wade Correctional Center.

b. That all Parties named herein violated the Plaintiff Parties Right to adequate Mental Health and Medical Treatment under the 8th amendment by denying and/or withholding the same.

c. That all Parties named herein violated Plaintiff-Parties right to be free from Cruel and unusual Punishment: Torture, Physical/Sexual Abuse, Inhumane Living Conditions, etc under the 8th Amendment.

d. That all Parties named herein violated Plaintiff-Parties rights to Due Process and Equal Protection of the laws under the 14th Amendment.

V. Relief

State exactly what you want the court to provide to you or do for you. Make no legal arguments. Cite no cases or statutes.

(See Attached)

VI. Plaintiff's Declaration

A. I understand that if I am transferred or released, I must apprise the Court of my address, and my failure to do so may result in this complaint being dismissed.

B. I understand that I may not proceed without prepayment of costs if I have filed three lawsuits and/or appeals that were dismissed on grounds that the action and/or appeal was frivolous or malicious, or failed to state a claim upon which relief may be granted, unless I am in imminent danger of serious physical injury.

Signed this _____ day of ______________________, ________.

Prisoner no. (Louisiana Department of Corrections or Federal Bureau of Prisons or Alien registration number)

Signature of Plaintiff

5/2006

IV. Relief Requested:

(a) Swift - Immediate Preliminary Injunction and Temporary Restraining Order against defendant parties to enjoin the unconstitutional actions claimed herein pending final Resolution of this civil action.

(b) Declaratory Relief to the same stating that the single and collective actions and in-actions of named parties herein violated Plaintiff-Parties 8th and 14th amendment Rights relative to the individual claims assigned herein.

(c) A "follow-up" Permanent Injunction based upon original reason outlined and warranting the granting of Preliminary Injunction etc.

(d) Compensatory Damages in the amount of $100 Million Dollars for all Plaintiff-Parties "collectively" named herein.

(e) Punitive Damages in the amount of $150 Million Dollars for all Plaintiff-Parties "collectively" named herein.

(f) Reasonable Attorney Fees in the amount of $25 Million Dollars for all attorneys of record.

V. Jury Trial Demand

Relative to all issues "triable by a Jury", the Plaintiff-Parties so named herein Request a Jury trial in accordance with the 7th Amendment.

Sworn Declaration:

Pursuant to 28 U.S.C. § 1746, I/we inmates (Plaintiff-Parties) named herein hereby declare under penalty of perjury that all of the foregoing is both true and correct.

Sworn this 28th day of March 2013.

(Co-Plaintiff-Party)

Submitted by and Sworn to by:
Carlos D. McGrew #413135
3/28/13
Date

Mr. Carlos A McGrew #413135
670 Bell Hill Road (D.W.C.C.)
Homer, La. 71040




PM PM APR 2 2013

LEGAL DOCUMENTS ENCLOSED

RECEIVED
APR 0 3 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA
BY BW

Clerk of Court, Ste. 1167
U. S. Western District Court
300 Fannin Street
Shreveport, La. 71101

X-RAY

Legal Documents Enclosed

NOT RESPONSIBLE FOR CONTENTS
APR 0 2 2013
DWCC

LEGAL Documents

LEGAL Documents